# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| KARL ARCHIBALD, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) No:3-20-cv-0591 |
| | ) (Crim. No. 3:18-cr-00084) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Respondent. | ) |

## MEMORANDUM OPINION

On April 5, 2018, a federal grand jury returned a three count Indictment against Karl Archibald charging him with Possession with Intent to Distribute Cocaine in a Public Housing Facility in violation of 21 U.S.C. §§ 841(a)(1), and 860 (Count One); Possession of a Firearm in Furtherance of a Drug Trafficking Crime in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Two); and being a Felon in Possession of a Firearm in violation of 18 U.S.C. § 922(g)(1) (Count Three).

On July 25, 2018, the grand jury significantly expanded the charges through a nineteen-count Superseding Indictment. This included three counts of Distribution and Possession with Intent to Distribute Cocaine Base and Cocaine in violation of 21 U.S.C. § 841(a)(1) (Counts One, Two, and Three); seven counts of Possession with Intent to Distribute Cocaine in a Public Housing Facility in violation of 21 U.S.C. §§ 841(a)(1), and 860 (Counts Four, Five, Six, Nine, Twelve, Fifteen, Sixteen); four counts of being a Felon in Possession of a Firearm in violation of 18 U.S.C. §§ 922(g)(1), and 924 (Counts Seven, Ten, Thirteen, Eighteen); four counts of Possession of a Firearm in Furtherance of a Drug Trafficking Crime in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Counts Eight, Eleven, Fourteen, Seventeen); and Maintaining a Drug-Involved Premises (Count Nineteen).

On October 25, 2018, Archibald pled guilty to Counts One, Eight, and Seventeen of the

Superseding Indictment pursuant to a plea agreement. He was sentenced on June 3, 2019 to a term of 90 months imprisonment on each count to run concurrently.

Now before the Court is Archibald's fully-briefed Motion to Vacate, Set Aside, or Correct Sentence that has been supplemented by counsel. (Doc. Nos. 1, 15, 18, 22). The motion, as supplemented, contain three grounds for relief: two assert trial counsel was ineffective and the other claims the Government engaged in vindictive prosecution. Defendant's initial *pro se* filing also includes what he characterizes as a "fruit of the poisonous tree" claim. Those claims will be considered in turn after the Court addresses a procedural issue relating to the timeliness of Archibald's claims.

### I.  Procedural Issue – Equitable Tolling

Section 2255 contains a one-year statute of limitations that runs from any of several different dates. 28 U.S.C. § 2255(f). The first of those, and the one that applies here, is "the date on which the judgment of conviction becomes final." Id. § 2255(f)(1). The Amended Judgment was entered on Archibald's convictions on June 4, 2019 and his convictions became final fourteen days later when the deadline to appeal passed without action. Thus, Archibald had until June 18, 2020 to file his motion under this deadline. However, the record reflects that Archibald did not sign and date his Motion until June 30, 2020, and the Court received the Motion for filing on July 10, 2020.[1]

The time limits for filing a Section 2255 Motion, however, are subject to equitable tolling. The Supreme Court has "made clear that a 'petitioner' is 'entitled to equitable tolling' only if he

---

[1] For present purposes, the Court uses the June 30, 2020 as the date of filing because, under the prison mailbox rule, a § 2255 motion is generally deemed filed when an inmate deposits the motion in the prison mail system prior to the expiration of the filing deadline. See Houston v. Lack, 487 U.S. 266, 270 (1988); Rule 3(d), Rules Governing Section 2255 Proceedings in the United States District Courts.

shows '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." Holland v. Florida, 560 U.S. 631, 649 (2010) (quoting Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005)). The Supreme Court has also stated that "the second prong of the equitable tolling test is met only where the circumstances that caused a litigant's delay are both extraordinary and beyond its control." Menominee Indian Tribe of Wis. v. United States, 577 U.S. 250, 257 (2016). Notably, "the doctrine of equitable tolling is used sparingly by federal courts," Robertson v. Simpson, 624 F.3d 781, 784 (6th Cir. 2010), and the movant bears the burden of showing that equitable tolling is appropriate. McClendon v. Sherman, 329 F.3d 490, 494 (6th Cir. 2003).

Archibald argues that "12 days after the deadline," he was finally able to file his Motion because of "the pandemic and his isolation in a county jail[.]" (Doc. No. 22). In support of his argument that equitable tolling applies, he cites three cases: Pickens v. Shoop, No. 1:19-cv-558, 2020 WL 3128536, at *3 (S.D. Ohio June 12, 2020) ("It also seems obvious that 'extraordinary circumstances' likely stand in the way of Pickens timely filing a complete petition. In fact, that is probably an understatement."); Cowan v. Davis, No. 1:19-cv 00745-DAD, 2020 WL 4698968, at *6 (E.D. Cal. Aug. 13, 2020) ("[T]he court concludes petitioner has shown that notwithstanding the continuing exercise of clearly reasonable diligence, the COVID-19 pandemic makes it unlikely and very well impossible that a complete federal habeas petition in this case can be completed and filed prior to the requested . . . deadline."); and Fitzgerald v. Shinn, No. CV-19-5219-PHX-MTL, 2020 U.S. Dist. LEXIS 109069, at *13 (D. Ariz. June 22, 2020) ("There is little doubt that ultimately, the COVID-19 pandemic will be considered an extraordinary circumstance meriting tolling for some period of time").

The Government is correct that each of the cases relied upon by Archibald were death penalty cases. It is also true that, in each, petitioner was represented by the Federal Defender's office and there was evidence that counsel were unable to have in-person interviews with their clients during the peak of the pandemic. However, equitable tolling in the COVID-19 era has not been limited to death penalty cases, and some courts have acknowledged that the pandemic may place an undue obstacle to those seeking to file a *pro se* motion to vacate. See e.g. Fortune v. United States, No. 2:15-CR-132, 2022 WL 816604, at *4 (E.D. Tenn. Mar. 16, 2022) (observing that "pandemic-related lockdowns and loss of law library access can warrant equitable tolling in certain circumstances"); United States v. Jones, No. 20 C 4098, 2021 WL 3033392, at *2 (N.D. Ill. July 19, 2021) (stating that "there are certainly circumstances in which government-imposed lack of access to a law library may entitle a habeas corpus petitioner or a section 2255 movant to equitable tolling"). Of course, and because it is a fact-driven inquiry subject to discretion, there are also plenty of cases that reach the opposite conclusion and this appears to be the overwhelming majority view. See e.g., Scott v. United States, No. 4:21-CV-838-RWS, 2021 WL 3910766, at *3 (E.D. Mo. Sept. 1, 2021) (collecting cases); United States v. Clay, No. 2:20-236, 2021 WL 2018996, at *3 (S.D. Tex. May 18, 2021) (same); United States v. Thomas, No. CR 18-135, 2020 WL 7229705, at *3 (E.D. La. Dec. 8, 2020) (same).

"The bottom line is that the COVID-19 pandemic does not automatically warrant equitable tolling for any movant who seeks it on that basis." Mims v. United States, No. 4:20-CV-1538 RWS, 2021 WL 409954, at *4 (E.D. Mo. Feb. 5, 2021). "The movant must establish that he was pursuing his rights diligently and that the COVID-19 pandemic specifically prevented him from filing his motion." Id.

The record reflects that Archibald, in his underlying criminal case, wrote a letter that the Court received on April 6, 2020, in which he asked that counsel be appointed to assist him in pursuing a section 2255 motion, among other things. (Case No. 3:18-cr-00084, Doc. No. 137 at 1, 2). That letter also suggested there were problems with his underlying convictions, including "ineffective counsel" and "prosecutorial misconduct." (Id. at 3). Two weeks later, on April 20, 2020, this Court received a second letter from Archibald where he (1) "request[ed] appointment of counsel for reasons of attacking judgment of ineffective council, prosecutorial misconduct, [and] to set aside and/or vacate sentence"; and (2) requested compassionate release due to being confined in an "unsanitary and hazardous environment" while suffering from "prostate cancer" and "bronchitis." (Id., Doc. No. 138 at 1).

The next day, the Court entered an Order denying without prejudice Archibald's requests. Among other things, the Court noted that there was a 1-year statute of limitations for filing a Section 2255 motion, that "[t]he Court d[id] not consider Defendant's letter in this criminal case as initiating a Section 2255 action"; and "direct[ed] the Clerk to mail Defendant a blank form for motions under 28 U.S.C. § 2255, for his use should he choose to file such a motion." (Id. Doc. No. 139 at 2).[2]

As the Government notes, the time between when Archibald's conviction became final and the time he first wrote the Court is approximately 10 months. The Government suggests that this shows a lack of diligence on the part of Archibald because "[d]uring this ten month period, he failed to raise any of these challenges or seek 2255 relief." (Doc. No. 18 at 9). Although not cited by the Government, there is some support for its position. See, United States v. Thomas, No. CR 18-135,

---

[2] In a subsequent Order, the Court denied Archibald's request for compassionate release without prejudice and stated that it would consider appointing counsel on that request if, and when, Archibald actually filed a motion for compassionate release. (Case No. 3:28-cr-00084, Doc. No. 140).

5

2020 WL 7229705, at *3 (E.D. La. Dec. 8, 2020) (finding equitable tolling inappropriate where (among other things) defendant did not "provide any explanation for why he could not have filed his § 2255 motion during the first eleven months of his sentence.").

The Court finds this position to be far too harsh for a couple of reasons. First, it is not uncommon for some to wait until the last minute to accomplish a task before the deadline. This does not make that approach wrong, and it certainly does not require a showing that a percentage of work was accomplished per month towards meeting the goal.

Second, one in Archibald's position would be amazingly prescient to predict that – 6 months after his conviction and 6 month before his Section 2255 deadline – COVID-19 would arrive in this country in January 2020 (www.cdc.gov/museum/timeline/covid19/outbreak) and that, two months later, on March 12, 2020, Tennessee's Governor would declare a state of emergency due to Covid-19, (www.tn.gov/governor/covid-19/covid19timeline). And one would really have to be an exceptional seer to further predict that the arrival of a pandemic would put the Grayson County Detention Center on lockdown and prohibit access to its law library around the time Archibald needed it.

It is true (as the Government notes) that Archibald knew he had a fast-approaching deadline, but it is not as if Archibald simply kicked-back and let that deadline pass without action. To the contrary, as May turned to June 2020, Archibald filed grievances with his jailer complaining about the lack of access to the law library, his need for the same to prepare his "federal" papers, and indicated the urgency of the situation because a deadline was fast approaching. Indeed, he filed grievances about the lack of access on June 1 and June 7, 2020. (Doc. No. 1 at 14, 15). Then, on July 2, 2020, Archibald filed a Grievance titled "Violation of My Rights" wherein he complained

6

that he had deposited his Motion in the mail on June 30, 2020, but it had been returned on July 1, 2020 because of the lack of postage. (Id. at 20).[3]

Given these circumstances, Archibald makes a plausible (if not strong) argument for tolling. However, the Court need not definitively decide the issue because none of his claims merit relief. See Boone v. United States, No. 4:20-CV-03092-SAL, 2021 WL 1816946, at *4 (D.S.C. May 6, 2021) ("Because the Court finds, as the following discussion will make clear, that Petitioner's motion fails on the merits, it will assume, without deciding, that Petitioner could meet his burden to show equitable tolling is warranted.").

## II. Substantive Issues – Ineffective Assistance of Counsel and Prosecutorial Misconduct

### A. General Standards Governing Section 2255 Claims

"The law generally gives federal prisoners just one chance to overturn a final criminal judgment – by alleging any and all errors in a single motion to vacate under 28 U.S.C. § 2255." Hueso v. Barnhart, 948 F.3d 324, 326 (6th Cir. 2020). Nevertheless, "Section 2255 is not a substitute for a direct appeal, and thus a defendant cannot use it to circumvent the direct appeal process." Regalado v. United States, 334 F.3d 520, 528 (6th Cir. 2003). Consequently, "to obtain collateral review relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal." United States v. Frady, 456 U.S. 152, 166 (1982). One who has failed to appeal a claim and therefore procedurally defaulted on that claim "must show either that (1) he had good cause for his failure to raise such arguments and he would suffer prejudice if unable to proceed, or (2) he is actually innocent." Id. (citing Bousley v. United States, 523 U.S. 614, 622 (1998)).

---

[3] According to the Grievance, Archibald placed his filing in the outgoing mail and, as he had in the past, wrote in the upper right hand corner of the envelope "Frank." Apparently, Archibald believed that this constituted franked mail, such that the institution was obliged to pay the cost of postage. (Id.).

7

**B. Ineffective Assistance of Counsel**

A criminal defendant is guaranteed the right to effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 686–87 (1984). "[T]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial [or plea proceedings] cannot be relied on as having produced a just result." Id. at 686.

"Defendants claiming ineffective assistance must establish two things. First, that the attorney's performance fell below "prevailing professional norms. And second, that the attorney's poor performance prejudiced the defendant's case." Monea v. United States, 914 F.3d 414, 419 (6th Cir. 2019) (citing Kimmelman v. Morrison, 477 U.S. 365, 381 (1986)). "Proving prejudice is not easy" because the petitioner is confronted with the "high burden" of demonstrating "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. (citing Davis v. Lafler, 658 F.3d 525, 536 (6th Cir. 2011)). In the context of guilty pleas, "a defendant must show the outcome of the plea process would have been different with competent advice." Lafler v. Cooper, 566 U.S. 156, 163 (2012). Importantly, "the Strickland performance standard does not require an attorney to raise every non-frivolous issue on appeal." Carver v. Straub, 349 F.3d 340, 348 (6th Cir. 2003) (citing Jones v. Batnes, 463 U.S. 745, 751 (1983)).

***1. 2–Level Premises Enhancement***

In the Presentence Report ("PSR"), the probation officer added a two-point drug-premises enhancement pursuant to U.S.S.G. § 2D1.1(b)(12). Archibald argues that counsel was ineffective in failing to challenge that enhancement because the record showed only the following:

8

- Archibald had made 9 cocaine sales to one person over the past 8 months.

- Three of those 9 sales were made in public establishments.

- Six of those 9 sales were made at his residence.

- From his residence, he made about $450 in sales per month (less than $6,000 per year).

- In his residence, he had stored two pistols, 13 grams of crack, 3 grams of powder, and utensils that he had used at least once to cook powder cocaine into crack.

(Doc. No. 15 at 11).

Archibald submits that "tax law gives useful guidance on determining when a home is used for business enough to be considered substantial." (Id. at 11-12). He then discusses several cases analyzing whether a residence is entitled to a tax credit. Archibald concedes that his argument is novel. (Doc. No. 22 at 2). Indeed it is.

The operative Guideline provides that, "[i]f the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance, increase by 2 levels." U.S.S.G. § 2D1.1(b)(12). The "enhancement applies to anyone who (1) knowingly (2) opens or maintains any place (3) for the purpose of manufacturing or distributing a controlled substance." United States v. Johnson, 737 F.3d 444, 447 (6th Cir. 2013). The Sixth Circuit has elaborated:

> A defendant may maintain a place for the purpose of distributing drugs even if that is not "the sole purpose for which the premises was maintained." A defendant thus may qualify for the drug house enhancement so long as "one of [his] primary or principal uses for the premises" is the distribution of drugs. A defendant also need not maintain the whole home for distributing drugs to qualify for the enhancement; using a "room" or another "enclosure" for "storage" of the drugs suffices, as the application note indicates.

Id. (citation omitted). And, "[w]here the defendant lives in the house, this [enhancement] is normally easily proved." United States v. Russell, 595 F.3d 633, 645 (6th Cir. 2010); see also, United States

9

v. Bell, 766 F.3d 634, 638 (6th Cir. 2014) ("No case to our knowledge has held that the statute does not apply to residences, where the activity of living there will invariably be the main, but not the only, purpose of the premises. Court after court has applied the statute to drug production and distribution at residences.")

Not only did Archibald live in an apartment at the J.C. Napier Homes, he sold cocaine from that residence on August 24, 2107; October 25, 2017; December 13, 2017; February 8, 2018; and March 1 and 8, 2018. (PSR ¶¶ 33-37). When Archibald was arrested, officers found firearms, drugs, and drug paraphernalia in his residence. (PSR ¶28). This is sufficient to warrant the drug-premises enhancement. Further, at the time of his arrest, Archibald was unemployed and last worked the "Summer 2017" earning $11.00 an hour (Doc. No. 7 at 1), making it highly unlikely that the CI's purchases were his only source of income.

Regardless, "[e]ffective assistance does not require counsel to raise every nonfrivolous argument" available. Fautenberry v. Mitchell, 515 F.3d 614, 642 (6th Cir. 2008). Likewise, "[a] lawyer does not perform deficiently by failing to raise novel arguments that are unsupported by then-existing precedent." United States v. Morris, 917 F.3d 818, 823 (4th Cir. 2019).

Archibald is not entitled to relief on his drug-premises enhancement claim.

### 2. *Count Eight – Ineffectiveness in Agreeing to or Failing to Object to "In Furtherance Of" Finding*

Count Eight charged Archibald with Possession of a Firearm in Furtherance of Drug Trafficking in violation of 18 U.S.C. 924(c)(1). The factual underpinnings of this charge were set forth in the Plea Agreement as follows:

> As it relates to Count Eight, on December 13, 2017, at defendant's residence in the Middle District of Tennessee, defendant knowingly possessed a firearm in

furtherance of a drug trafficking crime. Specifically, on that date, defendant sold a quantity of cocaine base and a handgun to a cooperating individual who was working with law enforcement officers. The controlled buy was audio and video recorded. Defendant was paid $550 for 13.44 grams of cocaine base (offense conduct), a Schedule II controlled substance, and was paid $450 for the handgun, which was a loaded Taurus, 40-caliber pistol. The firearm at issue incentivized the drug sale in that it "sweetened the pot" (United States v. Henry, 819 F.3d 856 (6th Cir. 2016), and therefore, furthered the drug transaction.

(Crim. No. 3:18-cr-00084 Doc. No. 57 at 6).

Post-conviction counsel submits that "Archibald's plea to Count 8 was not knowing and intelligent" because "everyone involved in Archibald's plea assumed he was guilty of the § 924© offense . . . based on facts that did not establish his guilt." (Doc. No. 15 at 13). "This mistake was made because" – unlike post conviction counsel – no one recognized "that the 924© offense charged against Archibald required a relatively stringent showing of a nexus between the firearm and the underlying crime." (Id.).

Counsel is correct that "18 U.S.C. § 924© criminalizes two separate offenses—(1) *using or carrying* a firearm *during and in relation to* a drug trafficking crime, and (2) *possessing* a firearm *in furtherance* of a drug trafficking crime." United States v. Combs, 369 F.3d 925, 931 (6th Cir. 2004) (italics in original). Counsel is also correct that Henry dealt with the former, *i.e.* the use or carry prong. More specifically, in Henry the Sixth Circuit reaffirmed its recognition that (1) "'the contemporaneous sale of drugs and a firearm in exchange for money constitutes carrying a firearm during and in relation to a drug trafficking crime under § 924(c)(1)(A)'"; and (2) "a firearm can be used to 'sweeten the pot' during a drug transaction when a drug purchaser 'offer[s] to purchase not only drugs, but other illegal goods' to persuade 'the drug seller to take the risks inherent in selling contraband.'" Henry, 819 F.3d at 866 (quoting United States v. Rivera, 502 F. App'x 554, 557 (6th

11

Cir.2012)). And counsel may also be correct that "Henry extended the sweeten-the-pot theory as far as it will go under its theory of mere facilitation." (Doc. No. 14 at 15) (citing United States v. Jackson, 877 F.3d 231, 242 (6th Cir. 2017)).

Recall, however, that to prevail on an ineffective assistance claims, defendant must show that he was not afforded "reasonably effective assistance" as measured by "prevailing professional norms." Rompilla v. Beard, 545 U.S. 374, 380 (2005) (quotation marks and internal citations omitted). "Judicial scrutiny of counsel's performance must be highly deferential," and a defendant can meet his burden only by showing that his lawyer's errors were so egregious "that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687-688.

Counsel was not ineffective for failing to recognize Henry's supposed limitation. Not only did counsel think Henry applied, so, too, did the Assistant United States Attorney who had an ethical obligation not to mislead the Court. See United States v. Lukse, 286 F.3d 906, 914 (6th Cir. 2002) (observing that "the professional code of ethics and ordinary decency drive prosecutors to act in good faith"). Further, unless the Court was complicit in some sort of charade, it, too, was duped. For this reason alone, Archibald has not shown ineffective assistance of counsel.

Recall also that to establish ineffectiveness, a defendant must also show that counsel's poor performance prejudiced him. Monea, 914 F.3d at 419. Archibald has not done so here because, Henry or not, he possessed a firearm in furtherance of a drug trafficking crime and admitted to doing so.

To be sure, "'in furtherance of' differs from 'during and in relation to' and requires the government to prove a defendant used the firearm with greater participation in the commission of

12

the crime *or that the firearm's presence in the vicinity of the crime was something more than mere chance or coincidence.*" United States v. Combs, 369 F.3d 925, 933 (6th Cir. 2004) (emphasis added). "Although the differences between the standards are 'subtle' and 'somewhat elusive,' they exist nonetheless." Id. Thus, "the possession of a firearm on the same premises as a drug transaction would not, without a showing of a connection between the two, sustain a § 924© conviction. In order for the possession to be in furtherance of a drug crime, the firearm must be strategically located so that it is quickly and easily available for use." United States v. Mackey, 265 F.3d 457, 462 (6th Cir. 2001).

Although answering the "in furtherance of" question requires a "holistic analysis," the Sixth Circuit has "identified a non-exclusive list of six factors," that aid the inquiry. Maya, 966 F.3d at 501. These include: "whether the gun was strategically located so that it was quickly and easily available for use, whether it was loaded, the type of weapon, the legality of its possession, the type of drug activity conducted, and the time and circumstances under which the firearm was found." Id.

Clearly, the facts agreed-to by the parties show that Archibald possessed the firearm in furtherance of a drug crime. (Doc. No. 57 at 6). The firearm was in Defendant's residence from which he sold drugs. It was a loaded Taurus .40 caliber pistol "which is a small weapon that is easily transported or concealed on the body, making it more likely to be used 'in furtherance' of a drug crime than would be, for example, a rifle." United States v. Gill, 685 F.3d 606, 611 (6th Cir. 2012). And, Archibald was not legally allowed to have a handgun because of his felon status. For this reason, too, Archibald has not shown that counsel was ineffective in failing to contest the 2-point drug premises enhancement.

**C. Vindictive Prosecution**

Archibald next argues that the Government engaged in vindictive prosecution. This is based on his three count Indictment ballooning into nineteen counts purportedly because he filed a motion to suppress.

"To punish a person because he has done what the law plainly allows him to do is a due process violation 'of the most basic sort.'" United States v. Goodwin, 457 U.S. 368, 372 (1982) (quoting Bordenkircher v. Hayes, 434 U.S. 357, 363 (1978)). However, "the Due Process Clause is not offended by all possibilities of increased punishment." Blackledge v. Perry, 417 U.S. 21, 27 (1974)). It is only offended "by those that pose a realistic likelihood of vindictiveness." Id.

"There are two approaches to showing prosecutorial vindictiveness: A defendant can show 'actual vindictiveness,' by producing 'objective evidence that a prosecutor acted in order to punish the defendant for standing on his legal rights,' or the Court can find a presumption of vindictiveness by applying the 'realistic likelihood of vindictiveness,' standard which focuses on the prosecutor's 'stake' in deterring the exercise of a protected right and the unreasonableness of his actions." United States v. Poole, 407 F.3d 767, 774 (6th Cir. 2005) (quoting United States v. Dupree, 323 F.3d 480, 489 (6th Cir.2003)).

To meet the "realistic likelihood of vindictiveness" standard, a defendant must show: "(1) the exercise of a protected right; (2) a prosecutorial stake in the exercise of that right; (3) unreasonableness of the prosecutor's conduct; and (4) the intent to punish the defendant for exercise of the protected right." United States v. Suarez, 263 F.3d 468, 479 (6th Cir. 2001). "Presumably, if the first three elements are present, this may help establish grounds to believe the fourth is present, that there is the required 'realistic likelihood of vindictiveness,' which the government would have

14

to rebut." Id. at 80 (citing Bragan v. Poindexter, 249 F.3d 476, 481–82 (6th Cir.2001)

> Archibald argues:
>
> Here, there is evidence – even without holding an evidentiary hearing – that the prosecutor's charging decision was motivated by Archibald's decision to litigate a potentially-winning Fourth Amendment issue. The prosecutor said he was willing to let Archibald plead under an agreement that involved just the one pending § 924© count as long as he cooperated. When defense counsel responded that, yes, Archibald was willing to cooperate but that he wanted to litigate and preserve his Fourth Amendment issue, the prosecutor responded by obtaining a new indictment that charged three additional § 924© counts that were based on evidence that the prosecutor had possessed all along and based on a theory that was either invalid [Count Eight] or was at least a stretch of the facts to satisfy the law. Those new charges suddenly subjected Archibald to effectively life in prison because he asserted his Fourth Amendment rights. This type of response to a valid assertion of Fourth Amendment rights is a violation of due process.

(Doc. No. 15 at 18) (citation omitted). "Because Count 8 was filed against Archibald out of prosecutorial vindictiveness," he argues the Court should vacate that conviction and re-sentence him.

Even accepting Archibald's portrayal of the facts as true, he has not presented any objective evidence to show the Government acted vindictively. Nor has he presented evidence sufficient to raise a presumption of vindictiveness, other than by showing he engaged in protected activity by filing a motion to suppress. The weakness of his claim is even more pronounced when the Court considers the Government's version of the facts that Archibald does not dispute.

According to the Government, Archibald flew onto its radar as a result of his membership in the Rollin 40s Crips and it broader investigation into the criminal activities of that gang. Indeed, when the grand jury returned its Superseding Indictment against Archibald, it also returned Indictments against seven other members of the Rollin 40s Crips. (Case Nos. 3:18-cr-00208 through 3:18-cr-00214). (Doc. No. 18 at 6 & n.2).

Because Archibald was arrested first, the Government sought his cooperation. Further, so

as not to show its hand to other potential gang-member defendants, the Government charged Archibald with crimes only involving the CI. (Id. at 3).

On May 8, 2018, Archibald filed his motion to suppress. At that time, the parties also began discussing Archibald's potential cooperation, conducting a proffer or reverse proffer, and ways to resolve the case, including a potential 5K1 motion for downward departure by the Government. The Government also provided Archibald with a potential plea agreement for his consideration. (Id. at 4).

During the first week of June 2018, the parties attended a reverse proffer in which the Government laid out its evidence against Archibald. The Government also told Archibald additional charges could be brought and for which he faced the prospect of an 80 year mandatory minimum sentence were he to be convicted. (Id.).

On June 22, 2018, trial counsel emailed the Government and asked if it could guarantee that no additional charges would be brought were his client to plead guilty. The Government responded in the negative, writing:

> If we were to base whether we brought additional charges against Archibald solely on his plea/cooperation or the lack thereof, and he decided against pleading/cooperating for whatever reason, and we then brought additional charges, I could foresee him arguing that the additional charges were vindictive because he decided to not plea/cooperate. We will not lock ourselves into such a stance. To the contrary, we will consider a host of factors (cooperation included) to determine whether additional charges will be brought.

(Doc. No. 18-2 at 1).[4] A week later, on June 29, 2108, trial counsel responded that Archibald would cooperate and enter into an open plea while at the same time preserving his right to pursue his

---

[4] This was in follow-up to an earlier email string in which the Government stated that it would not dismiss the Section 924 count from the original Indictment but it would move for a 5K1 reduction at sentencing were his client to cooperate and plead guilty to those charges. (Doc. No. 18-1 at 1).

motion to suppress. Not once did the Government take umbrage with that decision. In fact, after the Superseding Indictment was returned, Archibald engaged in at least four proffers. (Id. at 5, 7).

Ultimately, on October 25, 2018, Archibald pled guilty to Counts One, Two and Three of the Superseding Indictment in exchange for the Government dismissing the remaining sixteen counts. True to its word, the Government filed a 5K1 motion at sentencing. Although Archibald faced an advisory guideline range of 110 to 120 months on Count One, to which two statutorily required consecutive terms of 60 months would be added for Counts Two and Three, the Government moved for a sentence of 126 months consisting of 6 months on Count One and 120 months on the remaining counts. (Id. at 9). As noted previously, Archibald was sentenced to an effective term of 90 months.

In response to the Government's portrayal of events as summarized above, Archibald concedes that "[t]he government has shown that it expressly notified defense counsel . . . that its initial plea offer did *not* guarantee Archibald he wouldn't later be charged with multiple 924© counts that would expose him to a total mandatory minimum of 80 years[.]" (Doc. No. 22 at 4) (emphasis in original). Still, Archibald insist that the Government engaged in "actual vindictiveness" because the initial plea, even with a 50% reduction, was "effectively worthless" and "guaranteed no real benefit to Archibald even if he fully and successfully cooperated." (Id.). All this shows, however, is that the Government drove a hard bargain. It does not show vindictiveness because Archibald filed a motion to suppress.

The Supreme Court has noted that prosecutors commonly face pretrial motions but this does not portend that the response will be to retaliate:

> [A] defendant before trial is expected to invoke procedural rights that inevitably impose some 'burden' on the prosecutor. Defense counsel *routinely file pretrial motions to suppress evidence*; to challenge the sufficiency and form of an indictment;
17

> to plead an affirmative defense; to request psychiatric services; to obtain access to government files; to be tried by jury. It is unrealistic to assume that a prosecutor's probable response to such motions is to seek to penalize and to deter. The invocation of procedural rights is an integral part of the adversary process in which our criminal justice system operates.

Goodwin, 457 U.S. at 381. The Supreme Court in Goodwin went on to observe:

> A prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution. An initial decision should not freeze future conduct. As we made clear in Bordenkircher, the initial charges filed by a prosecutor may not reflect the extent to which an individual is legitimately subject to prosecution.

Id. at 381–82 (footnotes omitted); see also Suarez, 263 F.3d at 479 (noting that the burden prosecutors face in responding to a motion to suppress is "rather minimal").

"[T]he plea-bargaining process is often in flux," Missouri v. Frye, 566 U.S. 134, 143 (2012), with a lot of "give and take," Bordenkircher, 434 U.S. at 363. Initially, Archibald wanted to plead guilty with a promise of no additional charges, something that the Government made clear it was not willing to do from the outset. The negotiation at that point failed and the Government brought the charges it told Archibald might be forthcoming.

"When the pretrial addition of more serious charges results merely from the failure of the plea bargaining process, it is not vindictive prosecution." United States v. Walls, 293 F.3d 959, 970 (6th Cir. 2002) (collecting cases). "It does not matter that the government was fully aware of the facts and circumstances . . . on which the late-added charges were based long before it sought the . . . superseding indictment." United States v. Tippins, 630 F. App'x 501, 503-04 (6th Cir. 2015) (citing Bordenkircher, 434 U.S. at 359).

The most Archibald has shown is failure to reach an agreement before the Superseding Indictment was returned. He has not shown the Government acted vindictively by adding charges.

18

This claim fails.

### III. *Pro Se* Claims – Fruit of the Poisonous Tree

In his initial *pro se* filing, Archibald claimed that counsel was ineffective and that the Government retaliated for his filing a motion to suppress. Those claims have already been addressed and rejected.

Additionally, Archibald argued that all of the charges against him should have been dismissed because the evidence obtained was the fruit of a poisonous tree. Specifically, he submits that it was unlawful for the CI to drive and obtain drugs from him because the CI's license had been revoked and he had no insurance. He also claims that agents were aware that the CI was operating a motor vehicle unlawfully when he purchased drugs and firearms from Archibald.

Surprisingly enough, this is not the first time such an argument has been made. Unsurprisingly, however, it is routinely rejected. See, United States v. Spicer, 707 F. App'x 178, 179 (4th Cir. 2017) ("[P]ermitting the CI to drive to the transaction with Spicer on a revoked license did not violate any protected right of Spicer's."); United States v. Wilkerson, No. 2:16-CR-00218, 2017 WL 5616364, at *8 (S.D.W. Va. Nov. 21, 2017) (officers allowing unlicensed CI to drive to drug transaction was not flagrant violation warranting suppression of evidence). "Driving without a license violates state law, but has nothing to do with constitutional rights, nor does it raise constitutional questions." United States v. Harris, No. 4:06CR00052(1-2)WRW, 2007 WL 2236730, at *2 (E.D. Ark. Aug. 3, 2007). "In fine, this is not the kind of illegal action or exceptional circumstance to which the exclusionary rule is applied." Id.

Archibald's fruit of the poisonous tree argument fails.

19

## IV. Conclusion

On the basis of the foregoing, Archibald's Motion to Vacate, Set Aside, or Correct Sentence that has been supplemented by counsel (Doc. Nos. 1, 15) will be denied. Further, a Certificate of Appealability will not issue because Archibald has not (1) "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2); or (2) "demonstrate[d] that reasonable jurists would find [this Court's] assessment of the constitutional claims debatable or wrong,'" Miller-El v. Cockrell, 537 U.S. 322, 338 (2003) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)).

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE